IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BELTON CLARK QUEEN,

    Defendant.

CRIMINAL ACTION

NO. 1:19-cr-328-WMR-CMS

## REPORT AND RECOMMENDATION

This case is before the Court on three motions to suppress filed by Defendant Belton Clark Queen.  [Docs. 26, 27, 28].  For the reasons discussed below, I will recommend that the motions be denied.

## I.    BACKGROUND

On August 1, 2019, law enforcement presented a Criminal Complaint to United States Magistrate Judge Linda Walker [Doc. 1 at 1], along with a supporting affidavit signed by FBI Task Force Officer Laurie Nicholson, a detective with the City of Alpharetta.  [Doc. 1 at 2–8 ("Nicholson Aff.")].  In her affidavit, Detective Nicholson stated that there was probable cause to believe that Queen had used his cellular telephone to knowingly attempt to persuade, induce, entice, or coerce an individual who had not attained the age of 18 years to engage in sexual activity for which Queen could be charged with a criminal offense—child molestation—in violation of Title 18, United States Code, Section 2422(b).  [Nicholson Aff. ¶ 2].

In her affidavit, Detective Nicholson stated that between July 25 and July 31, 2019, an FBI Online Undercover Employee ("OCE") posed on the Internet as the mother of a thirteen-year-old girl.  [*Id.* ¶ 4].  The OCE then placed an advertisement on Craigslist stating that she was "looking for someone that knows what they are doing and looking for something that they haven't been able to find before. Unique, young fun situation available."  [*Id.*].  According to the affidavit, Queen responded to the ad on July 26, 2019, by email, after which the OCE and Queen corresponded about providing "experience" to the 13-year-old.  [*Id.* ¶¶ 5–6].  Detective Nicholson states in her affidavit that the OCE and Queen then began communicating by text message and phone, discussing what appears to be Queen's intent to engage in sexual activity with the (fictitious) child.  [*Id.* ¶¶ 8–12, 14].  Ultimately they agreed to meet at the Sonesta Hotel in Duluth, Georgia around 5 p.m. on July 31, 2019.  [*Id.* ¶¶ 13, 15].  Law enforcement agents, who staked out the hotel prior to Queen's arrival, arrested Queen after he parked his truck in the check-in lane.  [*Id.* ¶ 16].  Judge Walker signed the Complaint.  [Doc. 1 at 1].

On August 27, 2019, a grand jury sitting in the Northern District of Georgia returned a one-count indictment against Queen, charging him with attempted enticement of a child to engage in sexual activity.  [Doc. 14].  The indictment also contains a forfeiture provision by which the Government seeks forfeiture of the 2012 Dodge Ram Truck that Queen was driving at the time of his arrest.  [*Id.* at 1–2].

After being indicted, Queen filed three motions to suppress.  The first motion targets the search and seizure of Queen's phone following his arrest.  [Doc. 28].  The second motion seeks to suppress evidence seized pursuant to a warrantless search of Queen's truck following his arrest.  [Doc. 52, Transcript ("Tr.") at 4; Doc. 27].  And the third motion seeks to suppress statements Queen made on two separate occasions when he was being transported by law enforcement.  [Tr. at 3; Doc. 26].  On February 25, 2020, I held an evidentiary hearing on the motions to suppress.

## II.   FACTS PRESENTED AT THE EVIDENTIARY HEARING

### A.   *Queen's Cell Phone*

The Government called FBI Special Agent Joshua Riser to testify regarding Queen's cell phone.  [Tr. at 34].  According to the testimony, when Queen arrived at the Sonesta Hotel on July 31, 2019, Special Agent Riser and other agents were waiting for him.  [*Id.* at 34–35].  Special Agent Riser testified that he observed Queen exit the vehicle at which point he and other agents gave Queen a command with which Queen did not comply.  [*Id.* at 35].  Queen was then taken to the ground and arrested by a different agent.  [*Id.* at 35–37].  As Queen was taken to the ground, he held a mobile device in his right hand; the agents seized the mobile device as evidence as they arrested him.  [*Id.* at 35].

The Government also called Detective Laurie Nicholson, the task force officer who provided the affidavit in support of the Criminal Complaint, who testified that

she was also present at the hotel at the time of Queen's arrest, parked in the guest drop off/pick up area. [Tr. at 37–38]. Detective Nicholson testified that after Queen was arrested, an agent—who was not identified—brought her Queen's cell phone, which was lit up and unlocked. [*Id.* at 38–39]. She testified that when she was handed the phone, she could see text messages from "Amy," the OCE who had set up the meeting with Queen. [*Id.* at 39]. Detective Nicholson testified that she did not click on anything on the phone to open the messages and did not scroll through the messages on the screen. [*Id.* at 40]. She then placed the phone in the front seat of her vehicle and returned to where Queen was being detained to get him ready for transport to the detention center. [*Id.*]. When she returned to her vehicle, the phone screen was locked. [*Id.*]. The phone was later put in evidence. [*Id.*].

On August 5, 2019, United States Magistrate Judge Janet F. King authorized a search warrant for the contents of the cell phone. [Doc. 57-1 at 2]. The affidavit in support of the search warrant included background information about the investigation as well as extensive quotations from the emails and text messages between Queen and the OCE. Those emails and text messages reflect that Queen was seeking out sex with a (fictitious) 13-year-old child, that he was concerned about her becoming pregnant from the encounter, and that he planned to meet the OCE and the child at the Sonesta Hotel in Duluth. [Doc. 57-1 at 11–16]. The search warrant application also reflected that the agents determined that the phone number used to

text the OCE was registered to Queen and that Queen showed up at the Sonesta Hotel at the designated time. [*Id.* at 16–17]. The application also included the following statement:

> Agents arrested QUEEN after he parked his vehicle at the check-in lane of the Sonesta Hotel. QUEEN had his cell phone, the Target Device, in his hand as he exited the vehicle. Agents saw that the Target Device was on, his text messages were open on the screen, and the screen showed that he had been communicating with the OCE through the Target Device.

[*Id.* at 17].

### B.    *Queen's Truck*

The Government called FBI Special Agent Johanna Norman, who testified that she and other FBI agents conducted an "inventory search" of Queen's vehicle following Queen's arrest. [Tr. at 20–21]. She testified that another FBI agent moved the truck from where Queen had parked it at the front of the hotel to a side parking lot so that it would be out of the flow of traffic. [*Id.* at 22, 32]. According to Special Agent Norman, the officers decided to search the car because they were going to impound it, and they were looking for valuables and for anything dangerous. [*Id.* at 22–23]. The Government offered photographs of the truck that were taken during the search. [*Id.* at 26–27; Gov. Exs. 3–5]. Special Agent Norman testified that the officers did not find anything of significant monetary value or anything dangerous in the truck, but they did find personal lubricant and alcohol. [Tr. at 27–28, 33]. Following the search, the truck was towed to a secured parking lot at the Atlanta FBI

office. [*Id.* at 29–30]. The agents did not have a search warrant or a seizure warrant for the truck, and the search was not recorded on video or audio. [*Id.* at 32].

Detective Nicholson testified that on October 7, 2019, she conducted a complete search of the truck because it was going to be forfeited. [Tr. at 41]. She then made a list of everything that was inside the truck. [*Id.*]. The Government offered into evidence documents showing the list of items seized, along with the receipt for the property that was later returned to Queen on December 9, 2019. [*Id.* at 41–44; Gov. Ex. 7].

C.     *Queen's Statements*

FBI Special Agent Kelly Jo Strickler, who works on cases involving human trafficking and violent crimes against children, testified that she was on the arrest and transport team for Queen. [Tr. at 7–8]. She was present in the vehicle with Queen on July 31, 2019, when he was transported from the arrest location to the Atlanta City Detention Center. [*Id.* at 10]. She was also present in the vehicle with Queen the following day when he was transported from the detention center to court. [*Id.* at 13]. Special Agent Strickler testified that the officers did not read Queen his *Miranda* rights[1] and did not intend to interview him [*id.* at 9, 13, 16–17], yet Queen made unsolicited incriminating statements on both trips [*id.* at 11–12, 14–15].

---

[1] *See* Part III.C., *infra*.

On the day of Queen's arrest, Special Agent Strickler sat in the back seat of Detective Nicholson's patrol car with Queen as they drove him to the Atlanta City Detention Center. [Tr. at 10].  She testified that during that drive, she asked Queen "questions pertaining to the U.S. Marshal's booking packet so [she] could fill out the paperwork." [*Id.*].  According to Special Agent Strickler, these questions were part of the routine booking practice such as name, address, emergency contact information, medications, and identifying marks. [*Id.* at 10–11, 19].  She testified that Queen was able to answer these questions and did not appear to be confused by them. [*Id.* at 11].  According to Special Agent Strickler, a decision was made not to interview Queen because they believed he had used alcohol that day. [*Id.* at 16–17]. She also testified that although neither she nor Detective Nicholson asked Queen any questions about the offense conduct, Queen "spoke a lot" on the way to the detention center. [*Id.* at 10–11].  Queen's statements included that "he thought he might be guilty" and that if he ever found Amy (the mother of the fictional child that he was going to meet at the hotel), "he would hurt her." [*Id.* at 11–12].  These statements were not recorded. [*Id.* at 17].

Special Agent Strickler testified further that she and Detective Nicholson picked up Queen the next day from the detention center. [Tr. at 13].  She testified that upon greeting Queen, neither she nor Detective Nicholson asked Queen any questions about the offense conduct or his phone, yet Queen nevertheless provided

them with the passcode to his phone.  [*Id.* at 13–14].  According to Special Agent Strickler, Queen began talking when they were in the transfer area, and he continued to talk when they got in the vehicle.  [*Id.* at 14–15].  At that point, the officers decided to record what he was saying.  [*Id.* at 15, 17–18].  The Government introduced the recording into evidence.  [*Id.* at 15; Gov. Ex. 1].

## III.   DISCUSSION

As noted above, there are three pending motions before the Court related to Queen's cell phone, his truck, and his statements.

### A.  Cell Phone

Queen argues that the warrantless seizure of his phone violated the Fourth Amendment, and therefore all evidence from the phone should be suppressed.  [Doc. 54 at 14–15].  Alternatively, Queen argues that the cell phone warrant was not supported by probable cause because the affidavit included information that the agents obtained when they illegally viewed his unlocked phone without a warrant. [*Id.*].

The first issue is whether the phone was properly seized.  The law is clear that where probable cause exists for an arrest, a defendant's cell phone may properly be seized as evidence.  *See United States v. Fuentes*, 368 F. App'x 95, 98–99 (11th Cir. 2010).  Here, there was ample probable cause to arrest Queen when he arrived at the

Sonesta Hotel, and the agents were authorized to seize his phone for its evidentiary value.

The next issue is whether the agents violated Queen's constitutional rights by viewing the text messages on his unlocked phone, while they were in the process of seizing it from him. Although this specific point has not yet been decided, the Supreme Court has suggested, in dicta, that law enforcement can change settings on a phone to prevent encryption if they happen to seize a phone in an unlocked state. *See Riley v. California*, 573 U.S. 373, 391 (2014). Certainly, if such intentional manipulation and touching of a phone are permissible, then what the agents did here—merely look at the screen—is also permissible. The Court need not decide this question, however, because even if the agents' actions constituted a search that violated the Fourth Amendment, the evidence from the cell phone obtained pursuant to the search warrant is nevertheless admissible under the independent-source doctrine.

The independent-source doctrine provides that even where a Fourth Amendment violation has occurred, evidence "obtained from a lawful source, independent of the illegal conduct" is admissible. *See United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002). The rationale for the independent-source doctrine is that the Government should be put in the same position—not a worse position— that it would have been in if no error or misconduct had occurred. *See Murray v.*

*United States*, 487 U.S. 533, 537 (1988); *United States v. Jones*, 433 F. App'x 825, 828 (11th Cir. 2011) (holding that where law enforcement conducts an initial warrantless search and then obtains a search warrant, if the search warrant was obtained based upon information from an independent source, then the warrantless entry, even though illegal, would not require exclusion of the evidence).

Here, the warrant application contained ample evidence to establish probable cause to believe that evidence of a crime would be found on Queen's phone.  As noted above, the affidavit in support of the search warrant included extensive quotations from the emails and text messages between Queen and the OCE reflecting Queen's apparent desire to have sex with a child and his agreement to meet the OCE and the child at the Sonesta Hotel in Duluth for that purpose.  [Doc. 57-1 at 11–16]. The search warrant application also reflected that the phone number used to text the OCE was registered to Queen.  [*Id.* at 16–17].  And the application stated that Queen arrived at the meeting place at the designated time.  [*Id.*].  The additional facts that the agents obtained from Queen's unlocked phone (i.e., that Queen's phone was being used at the time of his arrest to communicate with the OCE) were not necessary to establish probable cause.[2]

---

[2] Queen also argues that the Government failed to present evidence as to which particular agent handled the phone before it was given to Special Agent Nickolson and what that agent may have done with the phone.  [Doc. 54 at 14]. Because the warrant is valid pursuant to the independent-source doctrine, the Court need not address this argument either.

10

Moreover, there was no evidence that the decision to apply for the warrant was prompted by what the agents saw on the unlocked screen; Special Agent Riser testified that he seized the phone as evidence, without ever looking at what was on the screen.  [Tr. at 35].  Under these circumstances, the warrant is valid, and Queen's motion to exclude evidence obtained from that warrant should be denied.  *See United States v. Barron-Soto*, 820 F.3d 409, 415–16 (11th Cir. 2016).

### B.  Queen's Truck

Queen next challenges the warrantless search of his truck, arguing that all evidence obtained from the search of his truck should be suppressed because the search was done without a warrant.  [Doc. 54 at 13–14].

The Fourth Amendment to the United States Constitution provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.  The starting point in evaluating a claim under the Fourth Amendment is to recognize the principle that warrantless searches and seizures are presumed invalid.   "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).  Inventory searches

of lawfully impounded automobiles are one such exception to the Fourth Amendment's warrant requirement. *See Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992). Law enforcement officers have the discretion to impound a car "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine*, 479 U.S. 367, 375 (1987); *Sammons*, 967 F.2d at 1543.

The evidence showed that agents arrested Queen as he was exiting his truck that he had driven to meet a thirteen-year-old child for sex. Special Agent Norman testified the FBI had decided to impound the truck, that the FBI was considering seizing the truck through forfeiture proceedings, and that she conducted an inventory search in the hotel parking lot because FBI policy required such a search. [Tr. at 22]. She testified that the purpose of the search was to look for valuables to be removed for safekeeping as well as anything that might be dangerous. [*Id.* at 22–23]. She testified that the agents took pictures of the truck and that she wrote a 302 report. [*Id.* at 23–26; Gov. Exs. 2–5]. The evidence also showed that FBI policy requires the agents to conduct an inventory search when a vehicle is impounded and that the agents followed the policies regarding such searches by creating a written summary showing the results of the inventory search. [Tr. at 28, 41–44; Gov. Exs. 6, 7]. Based on this evidence, I conclude that the inventory search of the truck was done pursuant to established procedures and did not exceed the scope of what was

required or allowed under the policy. *See Sammons*, 967 F.2d at 1543 (holding that an inventory search may include a search of closed containers, so long as the search is conducted pursuant to standardized criteria).

Queen also argues that the agents should have made an effort to contact Queen's family to permit them to pick up the truck before it was impounded. [Doc. 54 at 13–14]. But this argument has been squarely rejected by the Eleventh Circuit. Law enforcement officers are not constitutionally required to permit alternative dispositions of vehicles, so long as the decision to impound the vehicle is "made in good faith, based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity." *Sammons*, 967 F.2d at 1543. Queen has presented nothing to indicate that the decision to impound the truck was unreasonable under the circumstances or that anything about the search itself was improper.

Based on the evidence presented at the hearing and in the absence of any evidence that the search was a mere ruse for a general rummaging to search for evidence, I conclude that the agents in this case lawfully impounded the truck and then lawfully conducted an inventory search. *See United States v. Moss*, 748 F. App'x 257, 260 (11th Cir. 2018). Accordingly, I will recommend that Queen's motion to suppress evidence seized pursuant to that search be denied. *See United States v. Roberson*, 897 F.2d 1092, 1097 (11th Cir. 1990) (affirming denial of motion

to suppress where the evidence showed that an inventory search was performed in accordance with standard police procedures).

### C.  Queen's Statements

The Self-Incrimination Clause of the Fifth Amendment protects an accused from being compelled to testify against himself, or otherwise provide law enforcement with evidence of a testimonial or communicative nature.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 588–89 (1990).  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court concluded that in the context of custodial interrogations, certain procedural safeguards are necessary to protect this right against self-incrimination.  As a result, *Miranda* warnings must be given to a person in custody who is being interrogated; if they are not given, the statement may not be admitted into evidence at trial.  *See Rhode Island v. Innis*, 446 U.S. 291, 297 (1980); *United States v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993).  The safeguards of *Miranda*, however, do not apply to all statements.  Rather, *Miranda* warnings are required only if: (1) the person is in custody; and (2) he subjected to interrogation. *See Innis*, 446 U.S. at 300–01; *Stansbury v. California*, 511 U.S. 318, 322 (1994).

The term "interrogation" means that the defendant is subjected to express questioning or its functional equivalent and includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the

suspect." *Innis*, 446 U.S. at 301.  The defendant bears the burden of establishing that his statements were made in response to government interrogation.  *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001) (citing *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)) ("Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights.").

Here, Queen moves to exclude from evidence at trial all post-arrest statements he made to the agents because he was never given *Miranda* warnings.  [Doc. 54 at 7–12].  The Government responds that the statements are admissible because they were not the result of interrogation.  [Doc. 57 at 8–13].

### 1. *July 31, 2019 Statements*

With respect to the statements made on July 31 (when Queen was being transported from the arrest site to the detention center), Special Agent Strickler testified that the statements occurred while she was asking Queen "questions pertaining to the U.S. Marshal's booking packet so [she] could fill out the paperwork."  [Tr. at 10].  She described the questions as being part of the routine booking practice that elicited information such as name, address, emergency contact information, medications, and identifying marks.  [*Id.* at 10–11, 19].  She stated that

neither she nor Detective Nicholson asked Queen any questions about the offense conduct, yet Queen "spoke a lot" on the way to the detention center. [*Id.* at 10–11].

Queen argues that during that car ride, he told the agents his nickname, which could be an incriminating fact in this case. [Doc. 54 at 3, 11]. He argues that because this statement was made without the benefit of *Miranda* warnings, it is inadmissible. [*Id.* at 11]. The Government counters that a request for basic identification information, such as one's name and nickname, is excepted from *Miranda* protections under the routine booking exception. [Doc. 57 at 12].

The Supreme Court and the Eleventh Circuit have recognized a "routine booking question exception" which exempts from *Miranda*'s coverage questions to secure "biographical data necessary to complete booking or pretrial services." *Muniz*, 496 U.S. at 601. Law enforcement's questions regarding an individual's name, address, height, weight, eye color, date of birth, and age fall within the routine booking question exception. *Muniz*, 496 U.S. at 601; *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (rejecting argument that the officer's question about the defendant's address was intended to elicit incriminating evidence where no evidence was presented that the officer's reason for asking for the address was other than to secure routine booking information). Such questions are "reasonably related to the police's administrative concerns," and therefore fall outside *Miranda*'s protections. *Muniz*, 496 U.S. at 601–02.

Notwithstanding the booking exception, police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.  *Muniz*, 496 U.S. at 602 n.14.  As the Eleventh Circuit explained:

> We emphasize that police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained—as apparently were asked in this case—answers to such questions are inadmissible if the suspect has not been read his *Miranda* rights. Even questions that usually are routine must be preceded by *Miranda* warnings if they are intended to produce answers that are incriminating.

*United States v. Glen-Archila*, 677 F.2d 809, 816 n.18 (11th Cir.1982).

In his motion, Queen recognizes that "routine booking questions do not violate *Miranda*," yet he argues that the question regarding his nickname was designed to elicit an incriminating response.  [Doc. 54 at 10–12].  Queen cites to *United States v. Chavez-Maciel*, No. 1:10-CR-0490-TCB-LTW, 2012 WL 6742323 (N.D. Ga. Dec. 7, 2012), for the proposition that questions regarding a defendant's aliases are not routine booking questions, especially when the defendant was not being booked at the time the question was asked.  [Doc. 54 at 11].

*Chavez-Maciel* is distinguishable from the facts presented here.  In *Chavez-Maciel*, the defendant was asked for his name at the time of his arrest.  The agent then asked if he had any other names that he went by, and the defendant said, "Yes, people call me Picho."  *Id.* at *2.  The agent did not ask any further questions.  *Id.* The agent testified that his reason for asking about the alias was that he was trying

to verify that the person arrested was the person he was looking for.  *Id.*  The agent admitted that he was not booking the defendant at the time he asked the defendant about his aliases and that he intended to take the defendant back to the office to get the biographical information there.  *Id.*

In this case, Queen was in custody and en route to a detention facility when he made the statement, and the questioning occurred when the agent was filling out paperwork for Queen's booking.  There is no indication that the question was designed to aid in the investigation or was posed for any reason other than for booking.  The fact that the questions were asked in the car, rather than at a jail or in a formal booking environment, does not change this result.  *See United States v. Acuna*, No. 1:04-CR-571-CAP-CCH, 2005 WL 8173024, at *14 (N.D. Ga. Aug. 23, 2005), *adopted by* 2005 WL 8173030 (N.D. Ga. Oct. 12, 2005) (applying the booking exception to questions asked on the scene of the arrest); *see also Sweeting*, 933 F.2d at 964–65 (applying the booking exception to questions asked for purposes of filling out a standard arrest form during arrest).

Because the unrefuted evidence showed that the agents asked Queen about his nickname for routine booking purposes, and not for any other purpose, Queen's motion to suppress should be denied.  *See Sweeting*, 933 F.2d at 965 (finding that "no evidence was presented that Douglas' reason for asking Joseph his address was other than to secure routine booking information"); *United States v. Brown*, No. 07-

1341-cr, 2008 WL 4585325, at *3 (2d Cir. Oct. 14, 2008) (finding no violation of *Miranda* rights where the defendant was asked questions from a police booking form, including whether she had any nicknames or aliases).

### 2. *August 1, 2019 Statements*

Finally, Queen also seeks to exclude the statements he allegedly made on August 1, 2019, when he was being transported from the detention center to court. During the nearly eight-minute-long recording, Queen talked non-stop, without prompting. Special Agent Strickler testified that neither she nor Detective Nicholson asked Queen any questions about the offense conduct or his phone, yet Queen nevertheless elected to talk the whole time they were in the car. [Tr. at 13–18].

The recording begins with Queen speaking about what might be wrong with "the little girl" and his suspicion that "maybe there's something goofy about mom." [Gov. Ex. 1 at 0:15–0:42]. He then transitioned (with no prompting from anyone) to speaking about Craigslist, stating that it is "all about money." He then said that he expected the mother to ask him for money in the hotel lobby, but he was not going to pay anything. [*Id.* at 0:43–1:12]. He continued speaking, saying that he did not have enough cash on hand to rent a room; he had only about twenty or thirty dollars, and "how was I supposed to rent a room with that?" [*Id.* at 1:18–2:06]. He then said, "I don't have credit cards" because he had gone through identity theft four times. [*Id.* at 2:07].

19

At that point, a female voice asked: "four times?" [*Id.* at 2:10]. Queen responded: "twice with Lowe's." [*Id.* at 2:13]. The female then said: "you don't carry credit cards?" [*Id.* at 2:14]. In response, Queen talked for more than two minutes nonstop about two incidents where several thousand dollars' worth of fraudulent charges were placed on his Lowe's account. [*Id.* at 2:14–4:25]. About two minutes later, the female asked, "you are almost retired, though?" [*Id.* at 4:21–4:28]. In response to this question, Queen responded that when he is bored, he looks at Craigslist, which he described as fascinating. [*Id.* at 4:28–4:40]. He then talked about ads he saw for attractive women on Craigslist and the fact that the ads requested credit card numbers. [*Id.* at 4:45–5:45]. The recording ends as they reach their destination, with Queen describing an incident where he provided a credit card number to one of the sites and the charges he incurred as a result. [*Id.* at 6:30–7:27].

In his motion, Queen argues that Queen was subject to interrogation based on the agents posing the questions: (1) "Four times?"; (2) "You don't carry credit cards?"; and (3) "You are almost retired, though?" [Doc. 54 at 12]. The Government maintains that there was no formal questioning and that all of the statements were spontaneous utterances that do not implicate *Miranda*. [Doc. 57 at 10]. As for the questions asked, the Government states:

> The few questions that agents asked during the August 1, 2019, transport were clarifying questions in response to Defendant's spontaneous statements, which the Eleventh Circuit has held do not violate *Miranda. See Villegas-Tello*, 319 F. App'x at 875–76 (holding

that *Miranda* does not reach "police officer's follow-up questions, asked for the sake of clarification, to a defendant's spontaneous statements"); *see also Jules*, 244 F. App'x at 973 (holding that a defendant's answer to a question asked of him by an officer during transport was admissible because the officer's question was a "normal and natural inquiry" in response to defendant's spontaneous laughter); *Alvarez*, 2011 WL 589750, at *6 ("*Miranda* is not implicated where an officer responds to a defendant's voluntary statement by asking for clarification.").

[*Id.* at 10–11.]

As noted above, the *Miranda* safeguards come into play "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–01.  In contrast, voluntary incriminating statements—those not made in response to an officer's questioning—are admissible.  *See United States v. Suggs*, 755 F.2d 1538, 1541 (11th Cir. 1985).

The recording reflects that Queen volunteered his statements to the agents. The handful of short, follow-up questions cannot be viewed as an interrogation because they do not "reflect a measure of compulsion above and beyond that inherent in custody itself."  *Innis*, 466 U.S. at 300.  The Supreme Court has noted that "*Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices . . . ."  *Id.* at 301.  Here, there were no coercive police practices at play.  Queen made the decision to talk non-stop during his transport to court, and he chose the topics.  The recording reflects that Queen did so of his own volition and not at the prompting, much less coercion, of

the agents.  As such, the statements are admissible, and the motion to suppress them should be denied.  *See United States v. Villegas-Tello*, 319 F. App'x 871, 875 (11th Cir. 2009) (holding that questions asked for the sole purpose of clarifying the defendant's voluntary statements do not amount to an interrogation requiring *Miranda* warnings).

## IV.   CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Queen's three motions to suppress [Docs. 26, 27, 28] be **DENIED**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is therefore **ORDERED** that this case be and is hereby **CERTIFIED** as ready for trial.

**SO ORDERED AND RECOMMENDED** this 25 day of August, 2020.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE